IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DEBBIE JOHNSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MONTAGE NORTH AMERICA, LLC, a Delaware limited liability company,<br><br>Defendant. | MEMORANDUM DECISION & ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS<br><br>Case No. 2:23-cv-00612-JNP-JCB<br><br>District Judge Jill N. Parrish |

Debbie Johnson ("Ms. Johnson") alleges that Montage North America, LLC ("Montage") violated the Fair Housing Act and Americans with Disabilities Act by failing to accommodate her disability. Montage, in turn, seeks to compel Ms. Johnson to arbitrate her claims. For the reasons set out below, Montage's motion, ECF No. 18 ("Mot."), is **DENIED**.

FACTUAL BACKGROUND

Beginning in 2020, Debbie Johnson and her husband resided in a long-term residential unit at the Montage Hotel ("Hotel") in Utah's Deer Valley Resort.[1] The Hotel, which is operated by Montage, is a mixed-use, luxury resort comprised of rooms, long-term and permanent residences, and shops. Owners and guests of the Hotel's residences are permitted to use the Hotel's services and amenities, including room and maid service, restaurants, bars, spas, shops, and lounges. The Hotel frequently hosts outdoor events—such as weddings, receptions, and parties—on the Hotel's

---

[1] Mr. Johnson held title to the unit, and Ms. Johnson resided with him. Ms. The Johnsons executed a prenuptial agreement that provided for their separate property to remain separate during their marriage, and that Ms. Johnson accordingly had no property interest in the unit.

patio and lawn areas. Mr. Johnson's residential unit was immediately adjacent to the patio and lawn, and Ms. Johnson alleges that large speakers were often pointed toward the Hotel (and, in turn, her residence) and played loud music.

These noisy outdoor events made living at the Hotel difficult for Ms. Johnson who, since November of 2021, has suffered from a rare condition known as Ramsay Hunt Syndrome, which causes extreme sensitivity to sound. In May of 2022, Ms. Johnson brought her condition to the attention of Montage employees. Ms. Johnson and her husband requested reasonable accommodations to relieve her from the noise of the outdoor events. Ms. Johnson requested that the speakers be pointed away from her residence or their volume lowered, or that she be granted access to less noisy areas of the Hotel. Nevertheless, Ms. Johnson alleges that she was only provided an accommodation once (when Montage provided her with a room on the other side of the Hotel), and that Montage otherwise failed to accommodate her.

Although Montage suggested that Ms. Johnson would be provided discounted rates for quieter rooms during the outdoor events, no rooms were available when she requested one. Instead, Ms. Johnson sought to escape the noise by retreating into the residential lounge, accessible only to owners and guests of Hotel residences, which is insulated from the noise of the outdoor events. This provided only a partial solution, however. Because the residential lounge closed daily at 5:00 p.m. Ms. Johnson requested that she be allowed to remain in the lounge after 5:00 p.m. during the outdoor events, but Montage refused.

Ms. Johnson alleges that Montage responded to her requests for accommodations by going "on the offensive" and labeling her and her husband as "trouble[-]making malcontents." ECF No. 2 ("Compl."), ¶ 54. Montage initiated internal disciplinary actions against her and her husband to

bar them from accessing Hotel amenities, including the residential lounge. Montage scheduled and held a disciplinary hearing in February of 2023, which the Johnsons were not able to attend. Following this hearing, Montage issued sanctions against the Johnsons, barring them from accessing any of the Hotel's services and accommodations and revoking their access to the residential lounge.[2] Subsequently, Mr. Johnson sold his residential unit.

In September of 2023, Ms. Johnson filed this action. Her complaint raises three causes of action—first, for violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.; second, for violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.; and third, for retaliation under those two statutes. Through this lawsuit, she seeks compensatory and punitive damages. In November of 2023, Montage moved to compel Ms. Johnson to arbitrate her claims.

### *The Parties and Agreements at Issue*

The Hotel is owned by non-party entities. Montage contracts with the owner entities to manage and operate the Hotel on their behalf. Montage exercises the owner entities' rights to, *inter alia*, establish and amend Hotel rules, regulate Hotel services, and enforce the owner's contractual rights under its agreements with guests and residents.[3]

When Mr. Johnson purchased the unit, he agreed to the terms of these agreements. These include: (1) the Master Declaration, ECF No. 19-2[4]; (2) the residential Covenants, Conditions &

---

[2] Montage's stated grounds for the disciplinary action are briefly outlined in a letter transmitted to the Johnsons by Montage's counsel. *See* ECF No. 19-6. This letter was sent in November of 2022.

[3] Montage, through its motion, argues that it is not liable to the Johnsons by virtue of a contractual liability waiver contained in the Amenities Agreement. Mot. at 3. The court offers no opinion on this claim, however, and limits its analysis below to the narrow issue of arbitrability.

[4] Section 15.5 of the Master Declaration provides that:

Restrictions, ECF No. 19-4 ("CC&Rs"); (3) the Hotel Rules, ECF No. 19-3; and (4) the Amenities Use and Access Agreement, ECF No. 19-5 ("Amenities Agreement").[5] These Agreements contain arbitration provisions. The Amenities Agreement dictates that "any controversy or claim arising out of or relating to this Agreement or the relationship between the parties established hereby . . . shall be submitted to final and binding arbitration." Amenities Agreement, § 13 (bolding and capitalization removed). The Master Declaration, in turn, contains the following arbitration provision:

> Except with respect to Alleged Defects as provided in Section 15.17 below, in no event shall any Unit Owner have the standing to exercise any rights under this Master Declaration. In the event any such Unit Owner is aggrieved and wishes to pursue a claim with respect to any provision hereunder or otherwise against the Master Association, the Master Association Board or Hotel Owner, such Unit Owner may only do so through action it causes the Residential Association to take on its behalf. All disputes not involving claims for indemnity and arising under this Master Declaration between Hotel Owner, on the one hand, and the Residential Association on the other hand, shall, upon the request of either party, be resolved by binding arbitration conducted by a single, neutral arbitrator.

Master Declaration, § 15.16.[6]

---

> Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Resort is and shall be conclusively deemed to have consented and agreed to every covenant, condition, restriction and provision contained in this Master Declaration, whether or not any reference to this Master Declaration is contained in the instrument by which such person acquired an interest in the Resort.

ECF No. 19-2 at § 15.5 ("Master Declaration").

[5] Section 15 of the Amenities Agreement declares that "[t]his Agreement, the Hotel Rules and the Master Declaration are together to be construed to be the entire agreement among the Parties relating to the provision of Hotel Services to, and access to Hotel Amenities by, Residential Owner and any and all Authorized Parties."

[6] The agreement continues: "Hotel Owner, the Master Association, the Residential Association, and each Unit Owner agree to have all disputes described herein decided by neutral, binding

4

Ms. Johnson did not own the unit in question but was a permitted user under the terms of the Master Declaration. *See id.* at 93 ("'Permitted User' means any person who occupies a Unit or any part thereof with the permission of a Unit Owner, including, without limitation, Occupants, members of such Unit Owner's family and his or her guests, licensees or invitees.").[7]

## LEGAL STANDARD

Arbitration is contractual by nature. "A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Thus, while there is a strong and "liberal federal policy favoring arbitration agreements," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quotations omitted), such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract.

---

arbitration in accordance with the Federal Arbitration Act[.]" Master Declaration, § 15.16 (bolding and capitalization removed).

The CC&Rs also contain arbitration provisions. *See* CC&Rs §§ 13.3-13.9. Section 13.9 of the CC&Rs refers to the Master Declaration arbitration provision cited above. While the Master Declaration and CC&Rs are clear that they are governed by the FAA, the Amenities Agreement does not refer to that Act, but instead merely states that it is to be governed according to the laws of Utah. *Id.* § 19.

[7] The Master Declaration reads: "Unit Owners and their Permitted Users . . . shall: (i) subject to the terms and conditions of a separate amenities use and access agreement by and between the Unit Owner and Hotel Owner (or the Hotel Manager acting on behalf of Hotel Owner); and (ii) subject to such rules and regulations pertaining thereto as the Hotel Owner may from time to time establish, have access to and use of the facilities and amenities in the Hotel Areas[.]" *Id.* § 2.3.

Ms. Johnson was also identified in the Amenities Agreement as an authorized immediate family member, meaning that she was "authorized . . . to use the Hotel Amenities and the Hotel Services." Amenities Agreement at 4-5, 10.

"When it's apparent from a quick look at the case that no material disputes of fact exist[,] it may be permissible and efficient for a district court to decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014) (citing *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)). State law is applicable in determining both whether contract terms bind parties and whether contracts may be enforced by or against nonparties through, among other things, estoppel. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).

## ANALYSIS

### I.    Agreement Formation

Montage argues that Ms. Johnson agreed by her conduct to be bound by the terms of the agreements.[8] As mentioned above, Ms. Johnson was not a signatory to any agreement. Although she is recognized as an authorized immediate family member in Mr. Johnson's Amenities Agreement, meaning that she was "authorized . . . to use the Hotel Amenities and the Hotel

---

[8] The court notes that, because Montage raises this argument for the first time in its reply memorandum, it may properly be considered waived. This court ordinarily does not consider arguments raised for the first time in a reply memorandum. *See, e.g.*, *Rodriguez v. Utah Cty.*, 2023 U.S. Dist. LEXIS 34451, at *15 n.4 (D. Utah 2023) (citing *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)); *Clark v. Vivint Solar, Inc.*, 2020 U.S. Dist. LEXIS 220061, at *15 (D. Utah 2020) (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1201 (10th Cir. 2015), and *Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012)). However, because Ms. Johnson addresses this issue (apparently preemptively) in her opposition memorandum, the court will address the issue.

Additionally, in its motion, Montage argues that Ms. Johnson admitted, in a complaint filed in a state-court action, that the agreements at issue require her to arbitrate her claims. But reference to the state-court pleadings reveals nothing that could constitute an admission to be bound by any arbitration provision. *See* ECF No. 19-1.

Services," *see* Amenities Agreement at 4-5, 10, Montage's cursory argument that she, as a result, is also bound by all of its terms, is not fully argued—nor does it seem to comport with Utah law on the question. *See Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, ¶ 18, 148 P.3d 983 ("We hold that the fact that a person's name appears on a contract as a party to it, without more, is not direct and specific evidence that that particular person has assented to the agreement to arbitrate. In this case, it is therefore insufficient as a matter of law to show that [a nonsignatory] assented to an agreement to arbitrate.").[9]

Although Montage argues that, by accepting benefits flowing from the Amenities Agreement, Ms. Johnson became a party by contract through assent by conduct, it fails to provide sufficient "[d]irect and specific evidence" between Ms. Johnson and Montage in particular regarding the arbitration of future disputes. *Id*. ¶ 14 (citation omitted). "[U]sing the standard of direct and specific evidence, [this court] cannot infer that there was an agreement to arbitrate between the particular disputants in this case," Ms. Johnson and Montage. *Id*. ¶ 17. Further, "[e]ven if [Ms. Johnson's] conduct indicate[d] an assent" to the underlying Amenities Agreement, "it in no way indicates that [s]he assented to arbitration," because the arbitration provision therein is limited to the rights of the named parties and disputes regarding the parties' relationship. *See id*. ¶ 20.[10]

---

[9] *Ellsworth* sets a high bar for such "direct and specific evidence," declining to find as persuasive the fact that a nonsignatory was named in the contract-at-suit as the "Owner" of property *or* that the nonsignatory substantially participated in signatories' decision-making related to the contract. 2006 UT 77, ¶¶ 18-19.

[10] The Amenities Agreement defines "parties" as Mr. Johnson and DV Luxury Resort, LLC. Amenities Agreement at 1.

Secondarily, Montage argues that Ms. Johnson is subject to the terms of the Amenities Agreement, citing section 2.3 of the Master Declaration. *See* ECF No. 31 ("Reply Mem.") at 2-3. However, in making this argument, Montage incorrectly recites the language of this provision,[11] adding a crucial term ("be") and manipulating punctuation to alter the content and meaning of the provision.[12] The unaltered language of the Master Declaration does not suggest that permitted users themselves are subject to or otherwise must accept the terms of the Amenities Agreement or its arbitration provision.[13]

## II. Equitable Estoppel

Because Ms. Johnson is not bound by the terms of the agreements by and between her husband and Montage (or the Hotel-owning entities), Montage, much like the movant in *Ellsworth*,

---

Even if, *arguendo*, the arbitration provision is understood to be ambiguous but nevertheless *could* relate to claims brought by nonparties, the doctrine of *contra proferentem* would defeat Montage's motion. *See Ellsworth*, 2006 UT 77, ¶ 17 ("Any ambiguity in a contract is to be construed against the drafter[.]") (citing *Nielsen v. O'Reilly*, 848 P.2d 664, 666 (Utah 1992)). Thus, "[c]onstruing this discrepancy against [Montage] means that only [Mr. Johnson] assented to arbitrate because only [he] manifested [his] assent to arbitrate by signing the contract." *Id*. The same is true of the Master Declaration and CC&Rs.

[11] Montage claims that section 2.3 reads "Unit Owners and their Permitted Users . . . shall be subject to the terms and conditions of a separate amenities use and access agreement[.]" Reply Mem. at 2 (ellipses added and emphasis removed by the court).

But that section *actually* provides that "Unit Owners and their Permitted Users . . . shall: (i) subject to the terms and conditions of a separate amenities use and access agreement by and between the Unit Owner and Hotel Owner (or the Hotel Manager acting on behalf of Hotel Owner); and (ii) subject to such rules and regulations pertaining thereto as the Hotel Owner may from time to time establish, have access to and use of the facilities and amenities in the Hotel Areas[.]" *Id*. § 2.3.

[12] The court will assume that this misquotation was an innocent error, rather than an attempt to doctor the contractual language and deceive the court. Nevertheless, Montage is exhorted to ensure that it accurately represents contractual language to the court.

[13] And, even if this were the case, Montage's arguments would nonetheless fail for the reasons laid out above with regard to the Master Declaration.

must rely on a theory in equity to bind Ms. Johnson to one or more of the agreements. "Traditionally, five theories for binding a nonsignatory to an arbitration agreement have been recognized: (1) incorporation by references; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel." *Ellsworth*, 2006 UT 77, ¶ 19 n.11 (citing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000)). Montage seeks to compel Ms. Johnson to arbitrate her claims under the fifth theory—estoppel.

In *Ellsworth*, the Utah Supreme Court outlined two closely related theories of estoppel that can be wielded against nonsignatories to contracts: First, "where the nonsignatory has sued a signatory on the contract to his benefit but sought to avoid the arbitration provision of the same contract," 2006 UT 77, ¶ 20 (citing *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361 (5th Cir. 2003)); and second, where a nonsignatory "receives a 'direct benefit' from the contract which contains the arbitration clause." *Id*. (quoting *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999)). Importantly, "this variety of nonsignatory estoppel"—that is, the second or "direct benefit" theory—"has been employed only when the nonsignatory sues the signatory *on the agreement*[.]" *Id*. (quoting *Bridas*, 345 F.3d at 362) (emphasis added).

*Bridas*, in turn, relied upon by the *Ellsworth* Court, is clear on this point: "[In] cases where the courts seriously consider applying direct benefits estoppel . . . the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at 362 (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, S.A.S., 269 F.3d 187, 199 (3d Cir. 2001), *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d Cir. 1993), and *Int'l Paper Co.*, 206 F.3d at 418, and *Tencara*, 170 F.3d at 351); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 775 (2d Cir. 1995). Thus, in *Bridas*, the Fifth

9

Circuit, observing that the nonsignatory in that case did not sue "under the agreement," found the direct benefits theory of nonsignatory estoppel inapt. *Bridas*, 345 F.3d at 362.

*Ellsworth* did not merely "determine[] that, at the time, some courts had only applied direct benefit nonsignatory estoppel when the nonsignatory sued the signatory on the agreement." Reply Mem. at 9. Nowhere does *Ellsworth* imply that the cited courts' use of the direct benefit theory should be questioned—instead, it suggests that this is the proper restatement of this variant of the estoppel theory and conducts its analysis of the facts in that case accordingly.[14]

Even if some part of *Ellsworth*'s characterization of the direct-benefit theory of nonsignatory estoppel may be dictum under a strict theory of the holding,[15] "dictum of a court of last resort can be tantamount to a decision and therefore binding only in the absence of a contrary decision of that court." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 25 n.4, 345 P.3d 553 (quoting 20 AM. JUR. 2D COURTS § 134 (2014)).[16] Even if this were not the case, this court elects to follow

---

[14] To reiterate, *Ellsworth* simply states that "[a] nonsignatory will also be estopped when it receives a direct benefit from the contract which contains the arbitration clause," and that "[t]his variety of nonsignatory estoppel has been employed *only* when the nonsignatory sues the signatory on the agreement after receiving direct benefits but seeks to avoid arbitration." *Ellsworth*, 2006 UT 77, ¶ 20 (internal citations and quotation marks omitted; emphasis added). The *Ellsworth* Court, in characterizing that theory, straightforwardly suggests—or demands—that the direct-benefit theory only be applied where nonsignatories sue "on the agreement."

[15] *Ellsworth* itself states that it "hold[s] that the nonsignatory estoppel exception does not apply to Mr. Ellsworth, a nonsignatory who is not suing on the contract *and* who has not received direct benefits from the contract." 2006 UT 77, ¶ 20 (emphasis added). Some portions of *Ellsworth*, discussing what is and is not a necessary element for nonsignatory estoppel, may not be strictly "necessary [] in the logical chain of conclusions" leading to this statement of the holding under a narrow theory of *ratio decidendi*, and thus may technically be considered *obiter dicta*. *Liverpool & Great W. Steam Co. v. Phenix Ins. Co.*, 129 U.S. 397, 439 (1889) (citing *Railroad Company v. Lockwood*, 84 U.S. (17 Wall.) 357, 384 (1873)).

[16] The Utah Court of Appeals, in *Solid Q Holdings, LLC, v. Arenal Energy Corp.*, flattens and reformulates the analysis of the Utah Supreme Court in *Ellsworth*. *See* 2015 UT App 272, ¶ 8, 362

the Utah Supreme Court's characterization of the doctrine at issue, including with respect to the necessary elements for nonsignatory estoppel under a direct benefit theory, rather than parse the out-of-jurisdiction, non-precedential decisions that Montage cites.[17] Here, Ms. Johnson does not seek damages in accordance with the contracts by and between Mr. Johnson and Montage; similarly, her claims do not "hinge[] on [her] asserted rights under" any contract. *See Int'l Paper Co.*, 206 F.3d at 418. At bottom, then, like the plaintiff in *Ellsworth*, Ms. Johnson's claims do not rely on, and are thus not "on" or "under," any contract or contractual terms.

That Ms. Johnson's claims are not "on the contract" is bolstered by the Tenth Circuit's unpublished opinion in *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 Fed. App'x 704 (10th Cir. 2011) (unpublished), and the cases it cites. There, the Tenth Circuit generally considers a different estoppel theory (namely, regarding when a nonsignatory can compel a contract

---

P.3d 295 ("Arenal relies on the estoppel exception recognized in *Ellsworth*, in which the Utah Supreme Court determined a signatory can enforce an arbitration provision of a contract if a nonsignatory sues under the contract *or* seeks to benefit from that contract.") (emphasis added). Rather than interrogate the language of *Solid Q* to determine whether it accurately restates the holding of *Ellsworth*, this court will instead hew to the plain language of *Ellsworth* to characterize the Utah law of nonsignatory estoppel.

[17] Montage relies, for example, on *Nicosia* v. *Amazon.com, Inc.*, 384 F. Supp. 3d 254, 275 (E.D.N.Y. 2019), and *Bridge v. Credit One Financial*, 2016 U.S. Dist. LEXIS 44626, 2016 WL 1298712 (D. Nev. 2016). In *Nicosia*, the United States District Court for the Eastern District of New York relied on another district court decision (i.e., *Bridge*) to consider whether a nonsignatory plaintiff's claims were "so related" to an agreement that estoppel should apply. Significantly, the *Nicosia* district court relied primarily on the Washington law of "traditional equitable estoppel," and considered a direct benefit theory of estoppel only secondarily. The Second Circuit, in an unpublished order, affirmed the district court on alternative grounds—namely, not on the ground that the district court had properly applied either theory of nonsignatory estoppel, but instead "based on ordinary principles of notice and assent." *Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 613 (2d Cir. 2020) (unpublished). None of the cases cited by Montage for its argument that direct benefit estoppel may be applied against nonsignatories' claims not on the agreement are binding or, in the face of *Ellsworth*'s plain language, persuasive.

11

signatory to arbitrate claims under an agreement). However, that opinion's commentary regarding when a suit is "on" or "under" a contract or agreement (relevant in nonsignatory estoppel cases such as this one) is illuminating: "For a plaintiff's claims to rely on the contract containing the arbitration provision, the contract *must form the legal basis of those claims*; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them." *Id*. at 709 (citing *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1173-74 (11th Cir. 2011)) (emphasis added).[18] Thus, under either of the two nonsignatory estoppel arguments acknowledged under Utah law and raised by Montage, Ms. Johnson is not properly estopped to avoid the arbitration provisions at issue.

Alternatively, the court concludes that Ms. Johnson only benefited from the agreements at issue indirectly. An indirect benefit is "one where the nonsignatory exploits the contractual relation of parties to an agreement[] but does not exploit (and thereby assume) the agreement itself." *Ellsworth*, 2006 UT 77, ¶ 20 (quoting *MAG Portfolio Consult, GmbH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 61 (2d Cir. 2001)) (internal quotation marks omitted). While Ms. Johnson was able to exploit the agreement in receiving access to amenities and services, these benefits were entirely dependent on Mr. Johnson's status as residential owner; she merely exploited Mr. Johnson's

---

[18] Further, Ms. Johnson's claims are not on or under any agreement even under the looser formulation of the term as Montage would have this court adopt. Ms. Johnson's claims stand separate from the duties imposed on Montage by the Amenities Agreement. That agreement includes a description of hotel amenities and services available to the residential owners, authorized immediate family members, and authorized guests. *See* Amenities Agreement at 1–2, 4. Ms. Johnson has not brought suit alleging Montage's failure to provide access to amenities or services required under the Amenities Agreement; rather, she has brought suit for failure to provide reasonable accommodations for her disability. And, contrary to Montage's arguments, *see* Reply Mem. at 8, a duty or obligation to reasonably accommodate disabilities does not arise from any agreement—it is the result of statutory commands by Congress.

contractual relationship with Montage without assuming the agreement itself.[19] Because the benefits that Ms. Johnson received were merely the result of "the contractual relation of" other "parties to an agreement," her benefits are best characterized as indirect. *MAG Portfolio*, 268 F.3d at 61. Thus, Ms. Johnson satisfies neither criterion necessary for direct-benefit estoppel identified in *Ellsworth*.[20]

## CONCLUSION & ORDER

For the foregoing reasons, Montage's Motion to Compel Arbitration and Stay Proceedings, ECF No. 18, is **DENIED**.

DATED July 23, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

[19] *See, e.g.*, Amenities Agreement § 2 ("If this Agreement is terminated for any reason, Residential Owner shall not be released or discharged from any of its liabilities or obligations under this Agreement, including the obligation to pay the Hotel Owner for any Hotel Services requested by Residential Owner or any Authorized Party, *Residential Owner* agrees to pay") (emphasis added); *id*. § 4(b) ("Payment of such Service Charges shall be the obligation of the *Residential Owner*, regardless of whether the Hotel Services were requested by Residential Owner or any Authorized Party") (emphasis added); *id*. § 4(c) ("The applicable Service Charges for any Hotel Service shall be incurred by *Residential Owner* when such Hotel Services are requested by Residential Owner or any Authorized Party") (emphasis added).

[20] Ms. Johnson has also raised the argument that the arbitration provisions are not enforceable because they would preclude her from effectively vindicating her rights under two federal remedial statutes—the Fair Housing Act and the Americans with Disabilities Act. Having found that the arbitration agreements simply do not apply to Ms. Johnson, the court need not consider this alternative argument.